# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | | |
|---|---|---|
| BELDEN-HUTTER, INC., | ) | CASE NO. 5:23-cv-2209 |
| | ) | |
| PLAINTIFF, | ) | CHIEF JUDGE SARA LIOI |
| | ) | |
| vs. | ) | **MEMORANDUM OPINION** |
| | ) | **AND ORDER** |
| R.B. INTERNATIONAL, INC. | ) | |
| | ) | |
| DEFENDANT. | ) | |

By order dated March 12, 2024, following a case management conference in which both parties agreed that this dispute is governed by an unambiguous contract, the Court directed the parties "to file simultaneous motions regarding the meaning and scope of all pertinent provisions of the parties' governing contract (Doc. No. 1-1) that are needed to address the issues in dispute." (Doc. No. 18 (Briefing Order), at 1.[1]) Specifically, the parties were instructed to "address when the contract required the defendant to pay commissions to the plaintiff for different types of sales," as well as "any other disputed provision(s) of the contract that might have a bearing in resolving the issues in this case." (*Id.*)

Before the Court are the simultaneous motions submitted by each party. (Doc. Nos. 19 (Plaintiff's Motion) and 20 (Defendant's Motion).[2]) Both parties also submitted responses. (Doc.

---

[1] All page number references herein are to the consecutive page numbers applied to each individual document by the Court's electronic filing system.

[2] Belden-Hutter styled its brief as a motion for order and, although RBI styled its brief as a motion for judgment on the pleadings, the Court also construes RBI's brief as a motion for order.

Nos. 21 (Plaintiff's Response) and 22 (Defendant's Response).) The matter is now ripe for the Court's disposition.

I. **BACKGROUND**

Defendant R.B. International, Inc. ("RBI") "manufactures industrial products, primarily consisting of ball bearings, for use in industries including food and beverage, steel manufacturing, and construction." (Doc. No. 12 (Answer) ¶ 4.) Effective June 4, 2019, RBI hired plaintiff Belden-Hutter, Inc. ("Belden-Hutter") as a commissioned sales representative for a particular territory. (*Id.* ¶ 6; *see also* Doc. No. 1-1.) This action arises from RBI's alleged "fail[ure] to pay commissions or to provide complete or accurate sales information to Belden-Hutter." (Doc. No. 1 (Complaint) ¶ 13.)

The parties agree on several preliminary issues. First, the parties agree that their relationship, and therefore this dispute, is governed by contract. (*See generally* Doc. Nos. 19, 20.) Second, the parties agree that the relevant contract was validly amended twice, but also that the provisions at issue here are "identical" across all three iterations. (*See* Doc. No. 19, at 2 n.1; Doc. No. 20, at 8 n.1.) Accordingly, the Court follows the lead of the parties and refers to the various iterations of the contract collectively as the "Agreement." (*Id.*) Third, although the Agreement does not contain a choice of law provision, the parties agree that it should be construed under Ohio law. (*See* Doc. No. 20, at 11; Doc. No. 19, at 4.) Fourth, both parties insist that the Agreement is clear and unambiguous, although they present diametrically opposed interpretations of its terms. (*See* Minutes of Proceeding [non-document], March 12, 2024.)

Turning to the Agreement, the first paragraph, titled "Exclusive Representative," states:

Principal [i.e., RBI] grants to Agent [i.e., Belden-Hutter] the exclusive right (to the exclusion of Principal and all claiming under or through Principal), by acting as Principal's sales representative, to solicit orders for the Principal's goods, equipment and/or services __ (See exhibit A) __ (Products) within the following

>geographical or otherwise defined area. __ (See exhibit B) __ (Territory) Agent agrees not to represent another manufacturer within the defined area whose product or service is directly competitive to Principal.

(Doc. No. 1-1 ¶ 1.) The Agreement also defines the parties' relationship, stating that Belden-Hutter "is not an employee of Principal, but is an independent contractor" (*id.* ¶ 5), and that RBI alone sets the price and terms of any sale. (*Id.* ¶ 2.) The Agreement likewise makes clear that "[o]rders for Products within the Agent's territory shall be subject to acceptance by Principal" (*id.* ¶ 3), and that Belden-Hutter "does not have any right, power or authority to create any contract or obligation, either expressed or implied on behalf of [RBI]." (*Id.* ¶ 5.)

The third paragraph, titled "Orders and Collections," contains a provision obligating RBI "to refer and/or copy agent on all inquiries, and promptly furnish Agent with copies of all correspondence and pertinent documents between Principal and Customer." (*Id.* ¶ 3.) This paragraph further states that "[a]ll invoices shall be rendered by Principal to Customer, with copies to Agent," and that "[r]esponsibility for collection rests with Principal; however Agent agrees to assist Principal with collection when appropriate." (*Id.*)

Exhibit A to the Agreement identifies the RBI products for which Belden-Hutter was permitted to solicit orders, which includes all "RBI Product Lines excluding cam followers and track rollers." (*Id.* at 4.) The Agreement also contains a standalone paragraph reinforcing this point, stating that Belden-Hutter "will not be permitted to sell cam followers or track rollers manufactured by [RBI]." (*Id.* ¶ 9.)

As for commissions, the fourth paragraph of the Agreement provides that "[t]he commission payable to Agent on orders from the Agent's territory shall be deemed earned by agent upon acceptance or delivery of an order by Principal, whichever occurs first." (*Id.* ¶ 4.) The paragraph then explains how commission payments are calculated, and states that Belden-Hutter

is entitled to a "Split Commission" if the order "originat[ed] from one Agent's territory for shipment into another Agent's territory," but that Belden-Hutter's commission would not be split "when shipment is made into a territory without another Agent." (*Id.*) Lastly, the paragraph provides that "[a]ll commissions due agent for sales in Agent's territory shall be paid on the 10th of the month, immediately following Principal's receipt of payment from the customer." (*Id.*)

Finally, paragraph six states the term of the Agreement and the process for terminating the contract, and conditions that "[i]f the agreement is terminated, all orders received and accepted by Principal from Agent's territory prior to effective date of termination will be due commission as given in Paragraph Four regardless of when orders are shipped or invoices rendered." (*Id.* ¶ 6.)

As noted above, the parties agree that these are the relevant contractual terms, that Ohio law governs, and that the Agreement is clear and unambiguous. (*See* Minutes of Proceeding [non-document], March 12, 2024.) The parties disagree, however, as to what these allegedly clear and unambiguous terms mean. (*Id.*) Specifically, the parties dispute what Belden-Hutter was contractually obligated to do, if anything, to receive commission on sales for applicable products within its exclusive territory while the Agreement was in effect. (*Id.*)

Belden-Hutter contends that it was entitled to commission on "all orders of defined products from [its] exclusive territory, regardless of its involvement" in the sale. (Doc. No. 19, at 5.) Belden-Hutter grounds its argument in the plain language of the Agreement, which grants it an "exclusive right (to the exclusion of Principal and all claiming under or through Principal) . . . to solicit orders" of certain RBI products within a defined geographic area. (*Id.* at 5–6 (citing Doc. No. 1-1).)

RBI disagrees and asserts that the Agreement does require Belden-Hutter to take some action before it can earn a commission. According to RBI, the Agreement "merely gives Belden-

4

Hutter the exclusive right to '<u>solicit orders</u>' in an assigned territory" (Doc. No. 20, at 7 (emphasis in original)), and that "[t]he Agreement, read as a whole, demonstrates that (1) the parties did not intend for Belden-Hutter to earn commissions on sales from orders it did not solicit; and (2) RBI did not intend to relinquish the right to sell its products" in Belden-Hutter's territory. (*Id.* at 12.)

## II. STANDARD OF REVIEW

Under Ohio law, "the interpretation of written contract terms, including the determination of whether those terms are ambiguous, is a matter of law for initial determination by the court." *Savedoff v. Access Grp., Inc.*, 524 F.3d 754, 763 (6th Cir. 2008) (citing cases applying Ohio law); *see also Inland Refuse Transfer Co. v. Browning-Ferris Indus. of Ohio, Inc.*, 474 N.E.2d 271, 272–73 (Ohio 1984) ("If a contract is clear and unambiguous, then its interpretation is a matter of law and there is no issue of fact to be determined. However, if a term cannot be determined from the four corners of a contract, factual determination of intent or reasonableness may be necessary to supply the missing term." (citations omitted)).

"When confronted with an issue of contract interpretation, [a court's] role is to give effect to the intent of the parties." *Sunoco, Inc. (R&M) v. Toledo Edison Co.*, 953 N.E.2d 285, 292 (Ohio 2011). To that end, courts should "examine the contract as a whole and presume that the intent of the parties is reflected in the language of the contract." *Id.* In addition, courts should "look to the plain and ordinary meaning of the language used in the contract unless another meaning is clearly apparent from the contents of the agreement." *Id.*; *see also Alexander v. Buckeye Pipe Line Co.*, 374 N.E.2d 146, 150 (Ohio 1978) ("[C]ommon words appearing in a written instrument are to be given their plain and ordinary meaning unless manifest absurdity results or unless some other meaning is clearly intended from the face or overall contents of the instrument."). "When the

5

language of a written contract is clear, a court may look no further than the writing itself to find the intent of the parties." *Sunoco, Inc. (R&M)*, 953 N.E.2d at 292.

Courts may use extrinsic evidence to determine the parties' intent only if the contract is ambiguous. *Shifrin v. Forest City Enters., Inc.*, 597 N.E.2d 499, 501 (Ohio 1992). "As a matter of law, a contract is unambiguous if it can be given a definite legal meaning." *Westfield Ins. Co. v. Galatis*, 797 N.E.2d 1256, 1261 (Ohio 2003) (citation omitted). "Ambiguity exists only when a provision at issue is susceptible of more than one reasonable interpretation." *Lager v. Miller–Gonzalez*, 896 N.E.2d 666, 669 (Ohio 2008) (citation omitted). "[These] principles of contract interpretation establish that ordinarily judges interpret the language of contracts as a matter of law." *Royal Ins. Co. of Am. v. Orient Overseas Container Line Ltd.*, 525 F.3d 409, 421–22 (6th Cir. 2008).

## III.   DISCUSSION

Here, as in *Orient Overseas Container Line*, *supra*, "none of the parties have argued that the contract is ambiguous or that a factual controversy exists regarding [their] contractual intent, which would require resolution by a fact-finder . . . . Both sides argue that the plain language of the contract unambiguously favors the interpretations they advance." *Id.* at 422. Therefore, "the only questions of contract interpretation in this case are matters of law[.]" *Id.*

As the parties acknowledge, Ohio law generally recognizes two types of exclusive compensation agreements: (1) an "exclusive agency" agreement, and (2) an "exclusive sales" agreement (also referred to as an "exclusive right to sell" agreement). *See Dubuc, Lucke & Co. v. Diflora*, No. 99CA01, 1999 WL 606779, at *7 (Ohio Ct. App. Aug. 4, 1999). In an exclusive agency agreement, "the broker is entitled to his compensation on any sale except one made directly by the seller without the intervention of any broker or finder." *Id.* Conversely, in an exclusive sales

6

agreement, "the broker is entitled to his commission in the event of any sale of the business, no matter how it is brought about." *Id.*; *see also Dohner v. Bailey*, 485 N.E.2d 727, 730 (Ohio 1984) ("An exclusive right to sell contract differs [from an exclusive agency contract] in that in addition to granting the broker the right to sell to the exclusion of all other brokers, the seller also gives the broker the right to sell for the period of the contract even to the exclusion of the seller himself. Thus, should the property be sold during the term of the agency, the broker would be entitled to his commission regardless of whether or not he was the procuring cause of the sale." (citing 10 Ohio Jurisprudence 3d (1979) 113, Brokers, Section 81)). "The rationale of such a distinction appears to rest upon the premise the owner-seller agreed to compensate the broker for his efforts in attempting to procure a purchaser." *Dohner*, 485 N.E.2d at 730.

### A. The Agreement is an Exclusive Sales Agreement.

Upon review, the Court finds that the Agreement granted Belden-Hutter an exclusive right to sell RBI's products (save for cam followers and track rollers) in the defined territory. The first sentence of the Agreement states that RBI "grants to [Belden-Hutter] the exclusive right (to the exclusion of [RBI] and all claiming under or through [RBI]), by acting as [RBI]'s sales representative, to solicit orders for [RBI]'s goods, equipment and/or services . . . ." (Doc. No. 1-1 ¶ 1.) This provision clearly and unambiguously indicates that Belden-Hutter's rights were exclusive of both RBI and RBI's other agents/sale representatives. This type of arrangement constitutes an "exclusive sales" agreement under Ohio law. *See Bell v. Dimmerling*, 78 N.E.2d 49, 52 (Ohio 1948); *Dohner*, 485 N.E.2d at 730–31; *Mooney v. Green*, 446 N.E.2d 1135, 1137–38 (Ohio Ct. App. 12th Dist. 1982).

RBI's competing interpretation—namely, that the contract permitted it to compete with Belden-Hutter—relies almost entirely on the notion that the Agreement "merely gives Belden-

7

Hutter the exclusive right to 'solicit orders' in an assigned territory," and that "[n]owhere in the Agreement does the phrase 'exclusive right to sell' exist . . . ." (Doc. No. 20, at 7 (emphasis in original).) RBI contends that the Agreement's "plain language confirms that the 'right to sell' was vested in RBI alone." (*Id.* at 16.) According to RBI, the distinction between soliciting and selling is dispositive because if RBI retained the right to sell, then the Agreement cannot reasonably be interpreted as conveying to Belden-Hutter an "exclusive right to sell," and therefore must be construed as an exclusive agency agreement. (*Id.* at 12–14.)

In support of its argument, RBI cites to portions of the Agreement establishing the following: (1) RBI retained the exclusive right to set "prices and sales policies;" (2) "all orders solicited by Belden-Hutter were subject to acceptance by RBI;" (3) "RBI rendered invoices related to any sales" and "was responsible for collections;" (4) "Belden-Hutter was not given the 'right, power, or authority to create any contract or obligation, either expressed or implied on behalf of [RBI];" and (5) "RBI alone controlled when an order solicited by Belden-Hutter became a commissionable event" via its power to accept or reject any incoming orders. (*Id.* at 16.) RBI contends that these provisions establish that Belden-Hutter merely had a right to solicit, as opposed to a right to sell. (*Id.*)

RBI's argument misses the mark. The relevant distinction is not whether Belden-Hutter had an exclusive right to sell or an exclusive right to solicit; rather, the salient issue is whether Belden-Hutter's exclusion rights extended to RBI or merely to other sales representatives of RBI. *See, e.g.*, *Bell*, 78 N.E.2d at 51–52. Accordingly, RBI's reliance on the technical "distinction between the right to solicit orders and the right to sell" (Doc. No. 20, at 16) is misplaced. As Belden-Hutter correctly points out, it is inherent in "the very nature of a commissioned sales

8

representative/broker contract" that "[t]he sales representative never has title to the goods and therefore does not 'sell' in the sense of conveying title to them[.]" (Doc. No. 21, at 8–9.)

The legal insignificance of RBI retaining certain owner-specific rights is further reinforced when considering a compensation agreement in the real estate context (in which the "exclusive agency" versus "exclusive right to sell" distinction originated in Ohio). Under virtually all commission-based arrangements between a real estate agent and a seller-homeowner, the homeowner still retains the rights that RBI retained here: (1) the homeowner, not the agent, sets the price and terms of any sale; (2) all offers to buy the home are subject to acceptance by the homeowner, not the agent; (3) payment for the home is strictly between the homeowner and the purchaser, and any commission is paid separately; (4) the agent cannot unilaterally enter into or create a binding contract on behalf of the homeowner; and (5) the agent is not owed commission on offers that the homeowner rejects. Crucially, however, Ohio courts have repeatedly found real estate agents lacking these rights to have an "exclusive right to sell." *See, e.g.*, *Bell*, 78 N.E.2d at 52; *Dohner*, 485 N.E.2d at 730–31; *Mooney*, 446 N.E.2d at 1138. Accordingly, RBI's retention of these seller-specific rights is irrelevant to the question of whether the Agreement granted Belden-Hutter a right to earn commission on all orders within the defined area.[3]

Furthermore, reading the contract as a whole, as the Court is required to do, the Agreement's other provisions lend support to the conclusion that Belden-Hutter's right to commission was not dependent on its procurement of the sale. It is well-settled that a "reviewing

---

[3] RBI claims that "[c]ourts throughout the country have recognized the distinction between agreements that provide a 'right to solicit orders' and agreements that provide the 'right to sell.'" (Doc. No. 20, at 15 (citing *Hanson Sales & Mktg., Ltd. v. VSA, Inc.*, Case No. 98-3191, 2000 WL 1341799, at *5 (Wis. Ct. App. Sept. 19 2000); *Consol. Nats., Inc. v. Wm. T. Thompson Co.*, 623 F. Supp. 458, 462 (W.D. Ark. 1985); *Wilburn v. Jack Cartwright, Inc.*, 719 F.2d 262, 263 (7th Cir. 1983)).) However, these cases are non-binding and, more importantly, factually inapposite; all three analyze the same discrete and unrelated issue: whether a particular entity constituted a "dealership" under the Wisconsin Fair Dealership Law ("WFDL"), or a "franchise" under the Arkansas Franchise Act (which has "strikingly similar provisions" to the WFDL).

court should 'harmonize provisions and words so that every word is given effect' and avoid 'any interpretation of a contract that would render terms or provisions superfluous or meaningless.'" *Reeder v. Reeder*, 222 N.E.3d 734, 739 (Ohio Ct. App. 1st Dist. 2023) (collecting cases); *see also Wohl v. Swinney*, 888 N.E.2d 1062, 1066 (Ohio 2008) ("When interpreting a contract, we will presume that words are used for a specific purpose and will avoid interpretations that render portions meaningless or unnecessary." (citation omitted)); *Broad St. Energy Co. v. Endeavor Ohio, LLC*, 806 F.3d 402, 407 (6th Cir. 2015) ("In Ohio, as elsewhere, courts do their best to give a fair reading to the contract, one requirement of which is to give content where possible to each term of the contract." (citing *Farmers' Nat. Bank v. Delaware Ins. Co.*, 94 N.E. 834, 839 (Ohio 1911)).

Here, paragraph nine of the Agreement states that Belden-Hutter is "not permitted to sell cam followers or track rollers manufactured by [RBI]." (Doc. No. 1-1 ¶ 9.) This language is telling. If, as RBI insists, the parties' intention "was merely to create an exclusive agency relationship, which solely provides the right to solicit orders" and not the right to sell (Doc. No. 20, at 15), then this separate provision prohibiting Belden-Hutter from "sell[ing]" two specific products would be meaningless. On the other hand, such a prohibition is perfectly reasonable under Belden-Hutter's interpretation: Belden-Hutter was to receive commission on all accepted orders within its geographic area, except for orders of cam followers and track rollers.

Additionally, the Agreement repeatedly tethers commissionable orders to the geographic location of the order, and not to whether Belden-Hutter generated the sale. For example, the Agreement states that the "commission payable to Agent on orders from the Agent's territory shall be deemed earned by agent upon acceptance or delivery of an order by Principal[.]" (Doc. No. 1-1 ¶ 4.) Additionally, the Agreement provides that "[a]ll commissions due agent for sales in Agent's territory" became payable the month after RBI received payment from the customer. (*Id.*) And

whether Belden-Hutter would have to split its commission with another agent depended solely on whether the order originated from Belden-Hutter's territory but was shipped to a territory controlled by a different agent. (*Id.*) Finally, upon termination of the Agreement, "all orders received and accepted by Principal from Agent's territory prior to effective date of termination will be due commission . . . regardless of when orders are shipped or invoices rendered." (*Id.* ¶ 6.)

These provisions support the conclusion that Belden-Hutter earned commission on all orders received and accepted by RBI from Belden-Hutter's territory, regardless of Belden-Hutter's involvement in the sale. Nothing in the Agreement suggests that Belden-Hutter must have generated the sale in order to receive commission. *See Weaver v. Caldwell Tanks, Inc.*, 190 F. App'x 404, 410 (6th Cir. 2006) (applying Kentucky law, which is similar to Ohio law on this issue, and concluding that "the Agreement is a clear and unambiguous contract," and "[w]hen given their commonly understood meanings, the words in the contract do not require that Weaver procure or assist with sales in order to receive a commission").

### B. The Agreement Explicitly Grants Belden-Hutter Exclusive Rights.

Next, RBI contends that Ohio courts have "historically held that the intent to give an agent an 'exclusive right to sell' in a specified territory must be stated explicitly in the parties' agreement." (Doc. No. 20, at 13 (citations omitted).) And because the Agreement here "does not expressly require RBI to pay Belden-Hutter a commission on sales based on orders that RBI itself solicited," RBI contends that no such requirement exists. (*Id.* at 14.)

The Court disagrees that RBI's cited cases establish such a rule. Although the agreements in *Dohner*, *Mooney*, and *Bell* all contained some form of the phrase "exclusive right to sell," each court's analysis expressly focused on whether the agent's exclusion rights extended to the principal, not on the specific terminology used. And in *Dubuc*, the court concluded that the contract

was an exclusive agency agreement even though it was titled "Exclusive Seller Fee Agreement," because the terms of the contract simply provided that the agent was "the 'sole representative'" of the seller, "engaged on an 'exclusive basis.'" *Dubuc*, 1999 WL 606779, at *6. *Dubuc* explicitly rejected the notion that the name the parties ascribed to their relationship should control, stating that exclusive compensation contracts "should not rely upon such terminology," and instead "*should set forth whether the broker is entitled to a commission on all sales, and if not, which sales are excluded:* those made directly by the seller, those set forth on an attached list, or those defined in some other manner." *Id.* at *7 (emphasis in original) (citing *Bell*, 78 N.E.2d at 51).

Here, the Agreement is written precisely as *Dubuc* instructs. First, paragraph one unambiguously provides that Belden-Hutter's rights were "to the exclusion of [RBI] and all claiming under or through [RBI.]" (Doc. No. 1-1 ¶ 1.) Next, paragraph four broadly states that "Orders for Products within the Agent's territory shall be deemed earned by agent upon acceptance or delivery of an order by Principal[.]" (*Id.* ¶ 4.) Finally, the Agreement clearly identifies which sales are excluded: (a) sales outside of Belden-Hutter's exclusive territory; (b) sales of cam followers or track rollers; and (c) sales outside the term of the Agreement. These are the only restrictions to commissionable sales in the otherwise comprehensive Agreement. (*Id.* ¶ 8 ("This agreement contains the full and final agreements between the parties . . . .").)

"In matters of construction, it is the duty of this court to give effect to the words used, not to delete words used or to insert words not used." *Cleveland Elec. Illuminating Co. v. City of Cleveland*, 524 N.E.2d 441, 444 (Ohio 1988); *Bluemile, Inc. v. Atlas Indus. Contrs., Ltd.*, 102 N.E.3d 579, ¶ 23 (Ohio Ct. App. 10th Dist. 2017) ("A court may not rewrite a contract under the guise of construing it."). Accordingly, the Court declines to insert an additional, unwritten condition into the parties' contract that Belden-Hutter must have generated the sale in order to

12

receive commission on orders from its territory. *See Weaver*, 190 F. App'x at 410–11 ("[T]he Agreement provides that Caldwell will pay commission on chimneys and silos, other than water tanks, that are sold and approved by Caldwell. The Agreement does not require Weaver to have procured or to have assisted with the sales to be entitled to commissions. Therefore, under the terms of the Agreement, the commissions are earned when a sale of chimneys and silos, other than water tanks, occurs if Weaver is in compliance with his obligations under the Agreement.").

### C. Belden-Hutter's Exclusive Rights Were Exclusive of RBI.

Finally, RBI contends that the phrase "to the exclusion of Principal and all claiming by or through Principal" actually means that "RBI is excluded from and is therefore not subject to restrictions on soliciting orders itself." (Doc. No. 20, at 18.) RBI acknowledges that this phrase "may be subject to more than one meaning," but insists that its is "the only reasonable interpretation" because reading the Agreement as prohibiting RBI from selling its own products in Belden-Hutter's territory would be unfair, inequitable, or unusual. (*Id.* (emphasis in original).)

The Court disagrees. RBI's proposed interpretation would permit not only RBI to solicit products in Belden-Hutter's territory, but also anyone "claiming under or through" RBI, including other sales representatives hired by RBI. Such an interpretation is incompatible with RBI's own understanding of the Agreement (*id.* at 15 ("Thus, by its plain terms, the Agreement . . . [prohibited] RBI from doing business with another representative, in the defined territory")), as well as the plain language of the Agreement, which explicitly grants to Belden-Hutter "the exclusive right . . ., by acting as [RBI]'s sales representative, to solicit orders" within the specified geographic area. (Doc. No. 1-1 ¶ 1.) The Court also rejects RBI's suggestion that an exclusive right to sell agreement would be inherently unjust, a notion which is amply undermined by the many Ohio cases specifically contemplating and approving such arrangements since at least 1948.

13

*See, e.g.*, *Bell*, 78 N.E.2d at 52; *Dohner*, 485 N.E.2d at 730–31; *Mooney*, 446 N.E.2d at 1138. Accordingly, RBI's proposed interpretation is unreasonable, and therefore neither controls nor creates an ambiguity in the Agreement.

### IV.  CONCLUSION

For the reasons set forth above, the Court concludes that, under the terms of the Agreement, construed under Ohio law, plaintiff Belden-Hutter earned commission on all orders received and accepted by RBI from Belden-Hutter's exclusive territory excluding cam followers and track rollers. Accordingly, Belden-Hutter's motion for order (Doc. No. 19) is GRANTED, and RBI's motion (Doc. No. 20) is DENIED.

The parties shall now confer and, by July 19, 2024, submit a joint report as to what issues remain for resolution and how they propose these issues be addressed. In addition, now that this threshold issue of contract interpretation is resolved, the parties shall indicate in the joint report whether they are amendable to mediation before a magistrate judge, member of the Court's ADR panel, or a private mediator. The Court will conduct a telephone conference with counsel on July 24, 2024, at 1:00 p.m. to discuss a plan for going forward; directions for joining the call will be sent prior to the conference by email.

**IT IS SO ORDERED**.

Dated: June 24, 2024

**HONORABLE SARA LIOI**
**CHIEF JUDGE**
**UNITED STATES DISTRICT COURT**