UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| BELDEN-HUTTER, INC., | ) | CASE NO. 5:23-cv-2209 |
| | ) | |
| Plaintiff, | ) | CHIEF JUDGE SARA LIOI |
| | ) | |
| vs. | ) | |
| | ) | **MEMORANDUM OPINION** |
| | ) | **AND ORDER** |
| R.B. INTERNATIONAL, INC., | ) | |
| | ) | |
| Defendant. | ) | |

Before the Court is plaintiff Belden-Hutter, Inc.'s ("Belden-Hutter") motion for summary judgment on its breach of contract claim and partial summary judgment on liability under the Ohio Sales Representative Act, Ohio Rev. Code § 1335.11. (Doc. No. 54 (Motion).) For the reasons set forth below, the motion is **DENIED**.

I.  **FACTUAL BACKGROUND**

Defendant R.B. International, Inc. ("RBI") "manufactures industrial products, primarily consisting of ball bearings, for use in industries including food and beverage, steel manufacturing, and construction." (Doc. No. 12 (Answer) ¶ 4.) Effective June 4, 2019, RBI hired plaintiff Belden-Hutter as a commissioned sales representative for a particular territory. (*Id.* ¶ 6; Doc. No. 1-1 (Agreement).) This action arises from RBI's alleged "fail[ure] to pay commissions or to provide complete or accurate sales information to Belden-Hutter." (Doc. No. 1 (Complaint) ¶ 13.)

RBI's statement of facts paints the following picture:[1] In the spring of 2019, RBI launched a new heavy product line and in June enlisted the help of Belden-Hutter to promote this product line in a designated territory. (Doc. No. 61-1 (Balog Decl.) ¶¶ 6, 8; Doc. No. 61-2 (Fuentes Decl.) ¶ 8; Doc. No. 1-1.) Simultaneous with this initiative, RBI continued to sell its legacy product line[2] directly to customers through the efforts of RBI's own sales team. (*See* Doc. No. 61-1 ¶ 11; Doc. No. 61-2 ¶ 11.) RBI employees represented that, through their communications with Belden-Hutter employees and management, they believed that Belden-Hutter was aware and understood that Belden-Hutter would not receive commissions on sales in its territory brought in through the efforts of RBI's sales team. (Doc. No. 61-1 ¶¶ 19, 22, 29; Doc. No. 61-2 ¶¶ 19, 22, 29.) Further, RBI maintains that it always had the understanding that sales representatives, including Belden-Hutter, were not to be paid commissions on sales made through RBI's own efforts. (Doc. No. 61-2 ¶ 22.) RBI shared its understanding with sales representatives, including Belden-Hutter, through email and meetings. (Doc. No. 61-1 ¶¶ 21; *id.* at 14;[3] Doc. No. 61-2 ¶ 25.)

In August 2019, RBI Sales Manager Jeffrey Dunford ("Dunford") alerted RBI executives by email that several sales representatives were "VERY concerned that [RBI has] not provided customer lists and sales data." (Doc. No. 61-1, at 12 (emphasis in original).) Dunford recommended that RBI pay sales representatives commissions on RBI sales to legacy customers[4]

---

[1] As this is a motion for summary judgment, the Court views the evidence in a light most favorable to the non-moving party. *See infra* § III. The Court, therefore, primarily relies on non-movant RBI's characterization of the facts.

[2] The Agreement makes no reference to a "legacy product" or "legacy product line." (*See* Doc. No. 1-1.) Indeed, while RBI maintains that Belden-Hutter was enlisted to assist in promoting a new product line (Doc. No. 61, at 9), the Agreement appears to make no distinction between old and new products. In any event, RBI appears to define "legacy products" as "radial ball bearing[s][.]" (Doc. No. 61-1 ¶ 10.)

[3] All page number references herein are to the consecutive page numbers applied to each individual document by the electronic filing system.

[4] "Legacy customers" refers to customers RBI developed a business relationship with through the efforts of its own internal sales team and not the work of external sales representatives.

2

"as per the contract that [RBI executives] approved," recognizing that "I know there is some push back . . . but this is standard practice in our industry." (*Id.*) RBI Vice President of US Operations William Fuentes ("Fuentes") responded that "[t]he understanding in the beginning was new business" and that "[ownership] will pay commission on new business only[.]" (*Id.* at 11.) Dunford replied that "[w]e are violating the contract[]" and "we need to cancel the reps and re negotiate [sic]." (*Id.*) RBI did not take any subsequent action to address the issues raised by Dunford. (*See* Doc. No. 54-4 (Fuentes Depo.), at 21 (62)–22 (66)[5] (stating that RBI neither consulted with a lawyer nor terminated the representation agreements at large in response to the concerns voiced by Dunford).)

For almost two years following the start of the Agreement,[6] RBI did not send a single commission check to Belden-Hutter because Belden-Hutter did not generate any sales during this period. (Doc. No. 61-2 ¶¶ 28, 30.) And although Belden-Hutter was aware that RBI was making sales within its territory during this period through RBI's internal sales team (Doc. No. 55-1 (Hutter Depo.), at 60(235–36)), Belden-Hutter never questioned why they had not received commission checks from these sales (Doc. No. 61-2 ¶ 30).[7]

When Belden-Hutter started making sales in May 2021, RBI began sending Belden-Hutter monthly reports describing how many sales were made and how much Belden-Hutter was entitled to in earned commissions. (*See generally* Doc. No. 61-3 (Monthly Sales Report Emails).) The reports were limited to sales made through Belden-Hutter's own marketing efforts; they did not

---

[5] Because many of the depositions were reproduced in a four-to-a-page format, where a deposition citation includes a second number in parenthesis, the second number refers to the page number assigned by the court reporter.

[6] The Agreement went through three iterations. (Doc. No. 54, at 9–10.) Although the agreements made alterations to Belden-Hutter's geographic territory, it made no changes to the language regarding commission structure. (*Id.*)

[7] During this time period, however, Belden-Hutter and other sales representatives, had complained about a lack of transparent sales and account information. (Doc. No. 54-5 (Dunford Depo.), at 17–18; Doc. No. 54-6.)

3

include information on sales procured through RBI's sales team. (*See generally id.*) Although the reports and corresponding emails directed Belden-Hutter to review the information and advise if they had any questions, Belden-Hutter typically responded without raising any questions or did not respond at all. (*Id.*; Doc. No. 61-2 ¶ 34.) During this period, Belden-Hutter did not complain or express any concern that RBI was purportedly violating the Agreement by not paying Belden-Hutter commissions on sales procured through RBI's sales team.[8] (*See* Doc. No. 61-1 ¶ 27; Doc. No. 61-2 ¶ 24.)

Then, in or around May 2021, RBI terminated Dunford's employment as Sales Manager. (Doc. No. 61-2 ¶ 35.) Dunford thereafter provided Belden-Hutter with RBI's customer and sales information. (*Id.*; Doc. No. 55-1, at 23(87–89), 74(291–93).) This revelation caused Belden-Hutter to believe that they were being "significantly shorted" by RBI. (Doc. No. 55-1, at 77(305).) Yet Belden-Hutter did not immediately follow up with RBI on this issue despite opportunities to do so. (*See* Doc. No. 61-1 ¶ 40.)

Belden-Hutter first raised this issue in a telephone call to RBI's sales manager in September 2021, alleging that Belden-Hutter had not been paid full commissions on sales in its assigned territory. (Doc No. 55-1, at 80(316)–81(319), 312.) Belden-Hutter subsequently followed up on its call by email in October 2021 making the same claim. (*Id.*) RBI did not immediately address Belden-Hutter's allegations. (Doc. No. 54-9 (Lyle Email), at 1.) Hours after receiving Belden-Hutter's email, RBI's Director of Sales sent an internal email to Fuentes stating that "I didn't get back [to Belden-Hutter]" and "I am also not going to reply to [Belden-Hutter's email]" because "[i]t seems that this is a can of worms[.]" (*Id.*) Fuentes wrote back to RBI's Director of Sales, "[W]e need to have a discussion, I don't like where this is going . . . [.]" (*Id.*)

---

[8] Neither, however, did Belden-Hutter make any affirmative indication that it assented to any modification of the Agreement.

4

In March 2022, RBI sent Belden-Hutter a letter terminating the Agreement effective 60 days from its receipt. (Doc. No. 54-10 (Termination Letter), at 1). The letter outlined RBI's understanding that it would pay regular commissions "on *new line product orders*[9] received and accepted by Principal from Agent's territory prior to the Termination Date regardless of when orders are shipped or invoices rendered." (Doc. No. 54-10 (emphasis added).) A spreadsheet listing a complete summary of sales made by Belden-Hutter was appended to the termination letter.[10] (*Id.*) The termination became effective in May 2022 when the parties' working relationship ended. (*Id.*; Doc. No. 61-2 ¶ 42; Doc. No. 54-11 (Hutter Letter), at 1.) In September 2023, Belden-Hutter once again raised the issue of the unpaid commission payments. (Doc. No. 61-2 ¶ 43; Doc. No. 54-11, at 1.)

## II.   PROCEDURAL BACKGROUND

Belden-Hutter filed its complaint on November 14, 2023, alleging breach of contract and violations of Ohio Rev. Code § 1335.11. (*See generally* Doc. No. 1.) From the outset of this action, both parties agreed that the contract governing their relationship (Doc No. 1-1) was unambiguous, although each party presented starkly different interpretations. (*See* Doc. No. 17 (Report of Party Planning Meeting), at 4; Minutes of Proceedings [non-document], March 12, 2024.) The Court ordered the parties to file simultaneous motions regarding the meaning and scope of all pertinent provisions of the parties' governing contract that were needed to address the issues in dispute. (Doc. No. 18 (Order).)

The pertinent portions of the Agreement are reproduced below:

---

[9] The Agreement entitled Belden-Hutter to commissions on "RBI Product Lines excluding cam followers and track rollers." (Doc. No. 1-1, at 4.) The Agreement does not appear to draw any distinction between new and legacy product lines.

[10] Belden-Hutter contends that the sales information sent by RBI was incomplete. (*See* Doc. No. 54, at 16.)

> 1. Exclusive Representative. Principal grants to Agent the exclusive right (to the exclusion of Principal and all claiming under or through Principal), by acting as Principal's sales representative, to solicit orders for the Principal's goods, equipment and/or services . . . within the following geographical areas or otherwise defined area . . . . Agent agrees not to represent another manufacturer within the defined area whose product or service is directly competitive to Principal.
>
> ***
>
> 4. Agent's commission. The commission payable to Agent on orders from the Agent's territory shall be deemed earned by agent upon acceptance or delivery of an order by Principal, whichever occurs first . . . . All commissions due agent for sales in Agent's territory shall be paid on the 10th of the month, immediately following Principal's receipt of payment from the customer.

(Doc. No. 1-1, at 2.) The Court held that the relevant text of the Agreement indicated that it was an exclusive sales agreement under Ohio law. (Doc. No 23 (Memorandum Opinion and Order), at 7.) Interpreting the contract as a whole, the Agreement did not condition Belden-Hutter's right to commission on its procurement of the sale as RBI alleged. (*Id.* at 9.) The Agreement also expressly permitted Belden-Hutter exclusive sales rights that could be exercised to the exclusion of RBI itself. (*Id.* at 13.) In light of all this, the Court held that the Agreement was indeed unambiguous and entitled Belden-Hutter to "commission on all orders received and accepted by RBI from Belden-Hutter's exclusive territory excluding cam followers and track rollers." (*Id.* at 14.)

But the dispute did not end there. RBI raised a new assertion: that the parties' course of conduct modified the terms of the contract. (*See* Minutes of Proceedings [non-document], November 12, 2024.) The Court permitted discovery on this issue. (*See id.*)

Belden-Hutter has now moved for summary judgment. (Doc. No. 54.) In response, RBI contends that summary judgment should be denied because "the substantial body of evidence developed during discovery . . . establishes that the parties' course of conduct manifests a mutual agreement that [Belden-Hutter] would only earn commissions on sales generated through its own

6

marketing efforts within its assigned territory, and not on sales that came in through the efforts of RBI's inside and outside sales team[.]" (Doc. No. 61 (Response), at 6.)

### III. STANDARD OF REVIEW

When a party files a motion for summary judgment, it must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record . . . ; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

In reviewing summary judgment motions, this Court must view the evidence in a light most favorable to the non-moving party to determine whether a genuine issue of material fact exists. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970). A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). Determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary standards. And if the evidence "is such that a reasonable jury could return a verdict for the nonmoving party," then summary judgment is not appropriate. *Id.*

"Once the moving party has presented evidence sufficient to support a motion for summary judgment, the nonmoving party is not entitled to trial merely on the basis of allegations; significant probative evidence must be presented to support the complaint." *Goins v. Clorox Co.*, 926 F.2d 559, 561 (6th Cir. 1991). The party opposing the motion for summary judgment may not rely solely on the pleadings but must present evidence supporting the claims asserted by the party. *Banks v.*

7

*Wolfe Cnty. Bd. of Educ.*, 330 F.3d 888, 892 (6th Cir. 2003) (quotation marks and citation omitted); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986) (summary judgment is appropriate whenever the non-moving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial). Moreover, conclusory allegations, speculation, and unsubstantiated assertions are not evidence, and are not sufficient to defeat a well-supported motion for summary judgment. *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888, 110 S. Ct. 3177, 111 L. Ed. 2d 695 (1990). In other words, to defeat summary judgment, the party opposing the motion must present affirmative evidence to support his or her position; a mere "scintilla of evidence" is insufficient. *Bell v. Ohio State Univ.*, 351 F.3d 240, 247 (6th Cir. 2003) (quotation marks and citation omitted). Rule 56 further provides that "[t]he court need consider only" the materials cited in the parties' briefs. Fed. R. Civ. P. 56(c)(3); s*ee also Street v. J.C. Bradford & Co*., 886 F.2d 1472, 1479–80 (6th Cir. 1989) ("The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.") (citing *Frito-Lay, Inc. v. Willoughby*, 863 F.2d 1029, 1034 (D.C. Cir. 1988)).

**IV.     DISCUSSION**

Belden-Hutter moves for summary judgment on its breach of contract claim and partial summary judgment on liability under the Ohio Sales Representative Act. (Doc. No. 54.) The Court first analyzes whether Belden-Hutter meets its burden on its breach of contract claim, and then turns to the statutory claim.

    **A.     Breach of Contract**

Belden-Hutter represents that it has established a breach of contract as a matter of law. (Doc. No. 54, at 17–19.) Under Ohio law, a "breach of contract claim has four elements: 'the

existence of a contract, performance by the plaintiff, breach by the defendant, and damage or loss to the plaintiff.'" *New Lansing Gardens Hous. Ltd. P'ship v. Columbus Metro. Hous. Auth.*, 46 F.4th 514, 520 (6th Cir. 2022) (quoting *Savedoff v. Access Grp., Inc.*, 524 F.3d 754, 762 (6th Cir. 2008) (further citation omitted)).

RBI does not appear to contest the existence of the Agreement or Belden-Hutter's performance thereunder. (*See* Doc. No. 61, at 10 ("On June 4, 2019, RBI and [Belden-Hutter] entered into the Agreement[.]"); *id.* at 15 (acknowledging Belden-Hutter's "promotional activities on behalf of RBI").) Rather, the main dispute is whether RBI breached the contract by not paying Belden-Hutter commissions on independently procured sales by RBI's own sales team within Belden-Hutter's territory. (*Id.* at 20–24.) As the Court has already held (Doc. No. 23, at 11–14), the Agreement as originally executed entitled Belden-Hutter to such commissions. If the contract was in effect as originally executed, RBI's failure to pay such commissions would constitute breach as a matter of law.

RBI contends, however, that the Agreement was modified such that Belden-Hutter was not entitled to commissions on sales in which it was not involved. Specifically, RBI argues that the parties' course of performance[11] during the life of the Agreement modified the contract such that

---

[11] The parties seemingly conflate the terms "course of performance" and "course of conduct" throughout their briefing. However, the Court notes that the two terms are not interchangeable and have distinct meanings. As the Sixth Circuit in *Lincoln Elec.* discussed:

> "Course of performance" is defined as "[t]he *understandings* of performance which *develop* by conduct without objection between two parties *during the performance* of an executory contract." Black's Law Dictionary 352 (6th ed.1990) (emphasis added); *cf.* U.C.C. § 2–208(1) (1994). "Course of conduct," in contrast, is generally understood to denote "a series of acts over a period of time, however short, *evidencing a continuity of purpose.*" *Cf. Leydon v. Alexander,* 212 Cal. App.3d 1, 4, 260 Cal. Rptr. 253, 254 (1989) (quoting California statutory definition) (emphasis added).

*Lincoln Elec. Co. v. St. Paul Fire & Marine Ins. Co.*, 210 F.3d 672, 686–87 (6th Cir. 2000) (emphasis in original). These terms are also distinct from "course of dealing" which denotes "a sequence of previous conduct between the parties to a particular transaction which is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct." *Id.* at 687 n.15 (quotation marks and citation omitted)

9

Belden-Hutter "would only earn commissions on sales generated through its own marketing efforts within its assigned territory, and not on sales that came in through the efforts of RBI's Sales Team." (Doc. No. 61, at 21.)[12] Because of this purported modification, RBI asserts that it committed no breach.

"Parties may implicitly modify an agreement by their actions." *St. Marys v. Auglaize Cty. Bd. of Comm'rs.*, 875 N.E.2d 561, 568 (Ohio 2007) (citation omitted). "A continued, different, 'course of performance' between parties manifests a modification of the original agreement." *Id.* (quotation marks and citation omitted). Critically, while contract modification requires a meeting of the minds, *Wilson v. Prime Source Healthcare of Ohio*, No. 1:16-cv-1298, 2018 WL 1127653, at *6 (N.D. Ohio Mar. 2, 2018), such meeting need not be explicit for a modification via course of performance. After all, a course-of-performance modification is, by its very nature, implicit. *See St. Marys*, 875 N.E.2d at 568 (citation omitted). Rather, all that is necessary is "clear and convincing evidence" of conduct showing "the parties' mutual intent to modify the contract[.]" *Third Fed. S. & L. Ass'n. of Cleveland v. Formanik*, 64 N.E.3d 1034, 1044 (Ohio App. Ct. 2016) (quotation marks and citations omitted). Put differently, a course-of-performance modification

---

Because RBI's argument is premised on activities that occurred "during the life of the Agreement" (Doc. No. 61, at 5), the Court construes RBI's argument as one involving "course of performance" rather than "course of conduct." *See also Corp. Commc'n Servs. of Dayton, LLC v. MCI Commc'ns Servs., Inc.*, No. 3:8-cv-46, 2009 WL 3756274, at *13 (S.D. Ohio Nov. 9, 2009) ("[C]ourse of dealing refers to actions that take place prior to the formation of a contract and course of performance refers to actions that take place after the formation of a contract. Course of conduct may refer to actions both before and after a contract is formed."); *3385 Newmark Drive, LLC v. PNC Bank, Nat'l Ass'n*, No. 1:22-cv-671, 2024 WL 1119326, at *6 (S.D. Ohio Mar. 12, 2024) ("[C]ourts may look to the course of performance when interpreting a contract after a dispute has arisen between the parties after a period of operation under the contract."). Fundamentally, this dispute is not about the parties' continuity of purpose but instead about implicit contract modification in the course of the parties' performance.

[12] In arguing for a course-of-performance modification, RBI presents evidence regarding the parties mutual understanding of the contract "from the outset[.]" (Doc. No. 61, at 5, 10, 16.) RBI's presentation of such evidence is simply an attempt to relitigate the Court's interpretation of the unambiguous contract. (*See* Doc. No. 23.) RBI cannot present parol evidence to alter the terms of an unambiguous contract. *See Lincoln Elec. Co.*, 210 F.3d at 684 ("Intentions not expressed in the writing are deemed to have no existence and may not be shown by parol evidence[.]" (citation omitted)). And RBI cannot avoid this rule by simply reframing its argument as one for a course-of-performance modification. In evaluating RBI's course-of-performance theory, the Court will look to evidence of the parties' *performance*—not to statements of each parties' understanding of the unambiguous contract.

requires conduct showing "that [the parties] did not intend a particular provision of the contract to be strictly observed." *Automated Sols. Corp. v. Paragon Data Sys., Inc.*, 856 N.E.2d 1008, 1016 (Ohio App. Ct. 2006) (quotation marks and citations omitted).

    RBI argues that the contract was modified by the following course of performance: (1) Belden-Hutter knew that RBI made sales in Belden-Hutter's territory without Belden-Hutter's involvement; (2) Belden-Hutter accepted information and commissions on sales in which it was involved; and (3) Belden-Hutter did not promptly challenge, inquire into, or object to RBI's failure to provide information or commissions on sales in which it was not involved. (Doc. No. 61, at 8, 22.) The Court agrees that, if Belden-Hutter can provide evidence to support each assertion, it would at least raise a genuine dispute of fact as to whether the contract was modified by course of performance. Evidence that one party, over a period of time, knowingly accepted nonconforming performance from the other party can establish a course-of-performance modification. *See St. Marys*, 875 N.E.2d at 569 (finding modification by course of conduct where party accepted imperfect performance without objection); Dvorske, *et al.*, 18 Ohio Jur. 3d Contracts § 228 (noting as examples of implicit modification of contract, "a promise to pay money at a certain time is modified by the acceptance of notes of a third person payable at a later time, and acceptance by a lessor of a reduced rental constitutes modification of the rental contract"); *see also Formanik,* 64 N.E.3d at 1047 (stating that implied contract modification "might be inferred" from evidence indicating party's continued acceptance of nonconforming performance, though ultimately holding that trier of fact did not abuse discretion in finding no contract modification at trial).

    Here, RBI provides sufficient record support to raise a genuine dispute as to whether Belden-Hutter accepted nonconforming performance thus modifying the contract. First, RBI relies on the deposition of Belden-Hutter's 30(b)(6) representative, Kenneth Hutter ("Hutter"). (Doc. No.

11

55-1.) In his deposition, Hutter stated that, at the time Belden-Hutter executed the agreement, he was aware that RBI had established customers in Belden-Hutter's territory and that he did not expect RBI to stop selling directly to such customers. (*Id.* at 60(235–36).) Next, RBI points to monthly emails in which it appears that Belden-Hutter accepted sales figures that did not include sales in which Belden-Hutter had no involvement. (*See generally* Doc. No. 61-3.) Hutter appeared to acknowledge, during his 30(b)(6) deposition, that these monthly sales emails did not include sales figures for sales in which Belden-Hutter had no involvement. (*See, e.g.,* Doc. No. 55-1, 76(301).) Finally, RBI points out that, despite receiving monthly sales emails starting in May 2021, Belden-Hutter does not appear to have objected to RBI's failure to provide information or commissions on independent sales until September of that year. (*See generally* Doc. No. 61-3; *but see* Doc. No. 54-9, at 2 (email from Hutter to RBI recalling that Hutter had expressed concern regarding unpaid commissions in a conversation with an RBI representative in September 2021); 55-1, at 80(316–17).).

With this evidence, RBI raises a genuine dispute of material fact as to whether the parties modified the agreement such that Belden-Hutter would not be entitled to commissions on sales in its territory with which it had no involvement. From this evidence, a reasonable jury could find that Belden-Hutter knew that RBI sold products in its territory without Belden-Hutter's involvement, that Belden-Hutter did not receive commissions on those sales, and that Belden-Hutter, for some time,[13] accepted RBI's performance without raising any objection to the lack of commissions from such sales. From these facts a reasonable jury could find that the parties' performance manifested an intent to modify the contract such that Belden-Hutter was not entitled

---

[13] Belden-Hutter's first objection in September 2021 was 27 months after the Agreement was executed and took effect, four months after RBI sent its first year-to-date sales activity and commission report, and three months after Dunford provided Belden-Hutter with RBI's customer and sales information.

12

to commissions on sales it had no involvement in. While the record may contain contradictory evidence on these points, it is not for this Court to weigh such evidence on summary judgment. Such considerations are left to the jury.

Belden-Hutter, however, argues that: (1) course of performance cannot be used to circumvent a contract's unambiguous language; and (2) "any purported modification in this case fails for lack of consideration[.]" (Doc. No. 63 (Reply), at 5, 9.) However, the law does not support Belden-Hutter's arguments. While it is correct that course of performance cannot circumvent an unambiguous contract's language, it can be used to establish the modification of an unambiguous contract. *See Miller Lakes Cmty. Servs. Ass'n, Inc. v. Schmitt*, No. 8-cv-521, 2016 WL 515641, at *9 (Ohio App. Ct. Feb. 1, 2016) (considering the parties' course of performance even though the deed governing the dispute was unambiguous). Further, consideration is not required to modify a contract via subsequent acts. *Barclay Petroleum, Inc. v. Bailey*, 96 N.E.3d 811, 821 (Ohio App. Ct. 2017) (citations omitted).

Belden-Hutter thus falls short of meeting its burden of establishing the lack of a genuine dispute of material fact as to breach. Accordingly, the Court will deny summary judgment on its breach of contract claim.

    **B.**    **Ohio Sales Representative Act**

Belden-Hutter requests partial summary judgment on liability as to the claim for RBI's alleged violation of the Ohio Sales Representative Act, Ohio Rev. Code § 1335.11.[14] (Doc. No. 54, at 1.) "Under Ohio Rev[.] Code § 1335.11, a 'principal' must pay a 'sales representative' all commissions the principal owes the sales representative following the termination of a contract

---

[14] While RBI has waived opposition to summary judgment on this claim by failing to respond, *see Wood v. U.S. Bank Nat'l Ass'n*, No. 5:17-cv-2234, 2019 WL 1255229, at *3 (N.D. Ohio Mar. 19, 2019), the Court cannot grant summary judgment if Belden-Hutter does not meet its burden. *See Byrne v. CSX Transp., Inc.*, 541 F. App'x 672, 675 (6th Cir. 2013) (citations omitted).

13

between the two." *Marshall v. IT Guyz Sols., LLC*, No. 1:22-cv-493, 2024 WL 3857491, at *3 (S.D. Ohio Aug. 19, 2024) (citing Ohio Rev. Code § 1335.11(C)).

Because liability under the Ohio Sales Representative Act inherently depends on whether RBI failed to pay commissions *owed to Belden-Hutter*, it rises and falls with the breach of contract claim, which is premised on the alleged failure to pay commissions owed to Belden-Hutter. Here, the Court concludes that there is a genuine issue of material fact that precludes granting summary judgment on Belden-Hutter's breach of contract claim. As the Court denies summary judgment on the contract claim, it also denies summary judgment on the § 1335.11 claim.

## V. CONCLUSION

RBI has raised a genuine dispute of material fact as to whether the governing agreement was modified by the parties' course of performance such that RBI was not required to pay Belden-Hutter commissions on sales procured by RBI's marketing team within Belden-Hutter's designated territory. Accordingly, Belden-Hutter's motion for summary judgment is **DENIED**.

**IT IS SO ORDERED**.

Dated: October 20, 2025

**HONORABLE SARA LIOI
CHIEF JUDGE
UNITED STATES DISTRICT COURT**

14